Appellant Heather Bunn is appealing her conviction, for aggravated murder, from the Richland County Court of Common Pleas. The following facts give rise to this appeal.
The Richland County Grand Jury indicted appellant, on December 4, 1996, for the aggravated murder of Amanda French, which occurred on November 6, 1996. Appellant had two co-defendants that also assisted in the murder of French. Cassandra Clark plead guilty, prior to trial, as part of a plea bargain by admitting conspiracy to commit aggravated murder. Clark became a state's witness against appellant. Denise Spicer, appellant's other co-defendant, was charged with aiding and abetting appellant in the aggravated murder of French.[1]
The evidence at trial established appellant formulated a plan, to murder French, because appellant was jealous over a relationship French was having with appellant's ex-boyfriend, Lee Kelly. Lee Kelly lived in an apartment in Mansfield. Kelly was twenty-eight years old, unemployed and collected disability due to exposure to Agent Orange. Many teens frequented Kelly's apartment because he permitted underage drinking and marijuana use. The evidence at trial established that Kelly had sexual relations with appellant, Denise Spicer, Cassandra Clark and the victim, Amanda French.
Lee Kelly began dating appellant when she was fifteen years old and he was twenty-six years old. They dated for approximately two and one-half years. However, on September 29, 1996, the couple had an argument about appellant's age. Appellant apparently lied about her age when she began dating Kelly. In addition, the couple argued about Kelly having sexual relations, with Amanda French, earlier in the month. Three days after this argument, Kelly began dating the victim again.
The evidence also established that appellant and Denise Spicer were best friends. Appellant had been living with Spicer for almost a month prior to the murder. On November 6, 1996, appellant and Spicer drove to Kelly's apartment to pick up Cassandra Clark. At the apartment, appellant and the victim began to argue over Kelly. Appellant pulled the victim, by her hair, from the sofa, dragging her outside Kelly's apartment. Appellant punched, pushed and poured soda pop on the victim and Spicer spit soda pop on the victim.
Appellant and Spicer subsequently left Kelly's apartment to go to job interviews. Following their interviews, appellant and Spicer stopped at a Burger King restaurant where they began talking about a plan to murder French. They discussed using a gun. Appellant stated she was going to put the final touches on French. After leaving the Burger King restaurant, appellant and Spicer traveled to the home of appellant's brother where they retrieved a hand gun. After retrieving the gun, appellant and Spicer went to Spicer's house.
At Spicer's house, Spicer telephoned Shawn McCardle, telling him to hurry over to her house because she had something to tell him which could not be explained over the telephone. When he arrived, Spicer told him that she and appellant had a plan to murder Amanda French and that appellant was going to do the shooting. Spicer told McCardle that if he went along with the plan, he did not have to watch French die.
Appellant and Spicer began to discuss how they were going to lure French out of Kelly's apartment. They decided to apologize to French, at Kelly's apartment, for assaulting her earlier in the day, thereby winning back her trust. After recruiting a friend, Stephon Rodgers, to telephone Kelly's apartment to see if French was there, appellant, Spicer, Clark, McCardle and Rodgers all piled into a car to drive to Kelly's apartment. Upon entering the apartment, appellant and Spicer apologized to French and shook her hand. As Rodgers was a friend of French, they used him to lure French outside the apartment after the apology session. French did, in fact follow Rodgers out of the apartment and into appellant's vehicle under the assumption that they were going to Dairy Mart to purchase soda pop.
Spicer operated the vehicle under the direction of appellant. Appellant demanded that Spicer stop the vehicle in a secluded area. Clark suggested that the girls go to the bathroom together somewhere across a field. As appellant, Spicer, Clark and French were walking, appellant produced the revolver. Appellant and Spicer began arguing with French. Finally, appellant said, "I am tired of talking" and struck French in the back of the head with the butt of the gun. Appellant then shot French three time, at close range.
After appellant fired the first shot, French fell to the ground screaming "Oh my God." At that point, Spicer and Clark ran back to appellant's vehicle, leaving only appellant and the victim at the scene. Appellant fired two more shots at French before returning to her vehicle. Upon entering her vehicle, appellant put her head between her legs and complained about her ears ringing. At trial, Shawn McCardle testified that appellant said, "Thank God the bitch is dead." McCardle drove appellant's vehicle away from the murder scene. Subsequently, they stopped at appellant's brother's residence and returned the gun.
Following the murder, appellant telephoned Kelly faking concern for the victim's whereabouts. Appellant concocted a story that the victim left Dairy Mart with some unknown individual in a white, four door vehicle. At approximately 1:00 a.m., appellant again called Kelly asking him if he had seen the victim. The following day, Kelly asked appellant if she had seen the victim.
The day after the murder, Captain Faith and fellow deputies from the Richland County Sheriff's Department stopped appellant's vehicle and ordered her out at gun point. A deputy patted down appellant and handcuffed her for transport to the sheriffs department. Pursuant to standard operating procedures, appellant was placed in leg shackles. The leg shackles were connected, by handcuffs, to a ring in the wall to prevent escape.
Prior to commencing his interview with appellant, Captain Faith advised appellant of her Miranda rights. Appellant waived her rights both orally and in writing. Appellant did not request the presence of her mother and voluntarily spoke to Captain Faith. Appellant initially told Captain Faith that the victim never left Kelly's residence with them. Appellant stated the victim was picked up by a black male in a white Oldsmobile. Appellant also claimed she later saw the same black male, in the same white car, at the Blue Room Bar, but did not see the victim with him. After Captain Faith confronted appellant with the fact that Clark told of the murder of French, appellant explained to him how she planned and carried out the murder.
While at the sheriffs department, Captain Faith took an oral and taped statement from appellant. After her initial statement, sheriffs transported appellant to the Juvenile Attention Center. The following day, Captain Faith and Deputy Pat Smith took a second statement, from appellant, at the Juvenile Attention Center.
On November 8, 1996, appellant appeared before the judge of the Richland County Juvenile Court for a detention hearing. Appellant waived her right to counsel for purposes of the detention hearing. On November 18 and 21, 1996, appellant had appointed counsel represent her for purposes of bind-over, to adult court, in a probable cause hearing. Under R.C. 2151.26
and Juv.R. 30, this case was a mandatory bind-over due to the nature of the offense and appellant's age.
On January 8, 1997, appellant's counsel filed a motion to suppress the statements appellant made to Captain Faith during the interviews. The trial court overruled appellant's motion to suppress on February 3, 1997. Thereafter, this matter proceeded to trial on February 6, 1997. Appellant took the stand, at trial, and testified that Cassandra Clark fired the first two shots at Amanda French and that she only fired the third shot to silence the screaming which was actually only a figment of her imagination. Following deliberations, the jury found appellant guilty as charged. On February 14, 1997, the trial court sentenced appellant to twenty years to life on the aggravated murder conviction consecutive to three years mandatory incarceration for the firearm specification.
Appellant timely filed a notice of appeal on February 27, 1997. However, due to appellant's counsel's failure to file a brief, we dismissed this matter for want of prosecution on September 10, 1997. On February 19, 1999, we allowed leave of court, with the consent of the state, to permit appellant to re-instate her appeal. Appellant sets forth the following assignments of error for our consideration:
 I. THE TRIAL COURT ERRED PREJUDICIALLY BY FAILING TO SUPPRESS THE ACCUSED'S CUSTODIAL STATEMENTS WHICH WERE OBTAINED THROUGH COERCIVE TACTICS.
 II. THE VERDICT IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 I
In her First Assignment of Error, appellant contends the trial court erred in overruling the motion to suppress her custodial statements which were obtained through coercive tactics. We disagree.
On appeal, appellant challenges the trial court's findings of fact as it pertains to her motion to suppress. Under such a challenge, we must determine whether said findings of fact are against the manifest weight of the evidence. State v. Fanning
(1982), 1 Ohio St.3d 19; State v. Klein (1991), 73 Ohio App.3d 486; State v. Guysinger (1993), 86 Ohio App.3d 592. Specifically, appellant argues her statements were involuntary because she was shackled to a wall at the time she made the statements.
In order to establish a statement is voluntary, the state must first establish that Miranda warnings were given and voluntarily, knowingly and intelligently waived. Second, the state must establish the statements given were voluntary. Statev. Pierce (March 11, 1996), Stark App. No. 94 CA 0332, unreported, at 3, citing State v. Clark (1988), 38 Ohio St.3d 252,261. The mere fact a juvenile makes the statements does not preclude the use of the two-pronged test contained inClark. State v. Carder (1966), 9 Ohio St.2d 1, 9-10. The statements must be viewed by the totality of the circumstances even though the defendant is a juvenile. In re Watson (1989),47 Ohio St.3d 86, paragraph one of the syllabus. Further, there is no requirement, in Ohio, that parents must be present at the warnings for the statements to be voluntary. State v. Bell
(1978), 48 Ohio St.2d 270, 276-277.
In the Bell case, Justice Brown set forth the criteria for reviewing a juvenile's statement:
 When a minor is sought to be interrogated, the question of whether he intelligently and voluntarily waives his rights cannot always be decided by the same criteria applied to mature adults. See Haley v. Ohio (1948), 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, In re Gault (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527. Such criteria necessarily varies with certain factors as the age, emotional stability, physical condition, and mental capacity of the minor. Appellant was adjudicated competent to stand trial as an adult, and thus is not afforded as much protection as a very young or disabled child who is not as capable of intelligently waiving his rights. Bell at 277.
In the case sub judice, we must first determine whether appellant voluntarily, knowingly and intelligently waived her rights. Upon her arrival to the interview room, Captain Faith immediately read appellant her Miranda rights which appellant waived orally and in writing. Tr. Suppression Hrng. at 20. In considering the factors contained in Bell, the record indicates appellant was seventeen and one-half years old at the time of her arrest. Id. at 15. Appellant attended high school at Mansfield Senior High School where she received average grades while regularly attending school. Id. at 45. However, due to poor attendance, appellant's grades deteriorated. Id. at 69. The record also indicates that two weeks prior to the murder, appellant moved from her mother's residence and began residing with Cassandra Clark. Id. at 12. Appellant previously held jobs, dealing with the public, at K-Mart and McDonald's.Id. at 62.
As to her emotional stability, appellant was composed and thoughtful while making her statements to Captain Faith.Id. at 26. At the time of the interview, appellant was not intoxicated or under the influence of drugs. Id. at 25. Appellant never asked to speak with her mother or an attorney.Id. at 25-26. Captain Faith testified that mentally, appellant appeared to understand the interview process and never indicated she was confused or misunderstood a question. Id. at 26. According to Captain Faith, appellant's behavior was not unusual or extraordinary in any way. Id. at 27.
Although leg shackles were placed on appellant, in the interview room and remained on appellant during the duration of the interview, we do not find such conduct coercive in nature. This is a standard operating procedure of the Richland County Sheriff's Department. Id. at 18. Further, appellant was shackled only a short period of time before she confessed. It appears appellant confessed, not due to duress from the shackling, but due to the fact that Captain Faith told her Cassandra Clark informed him of what really transpired on the evening Amanda French died. Id. at 22-23. The record also indicates the total amount of time appellant spent in the interview room was two hours. Id. at 26.
Appellant made her second statement, to Captain Faith and Deputy Pat Smith, while at the Juvenile Attention Center. Prior to taking this statement, appellant was again givenMiranda warnings which were part of the taped statement. Id. at 32. Appellant indicated she understood her rights and waived them. Id. This interview lasted approximately thirty minutes.Id. at 34.
Based on the above evidence, we find appellant voluntarily, knowingly and intelligently waived her rights. As to the second prong concerning whether appellant voluntarily made these statements, we find the above evidence also establishes appellant made these statements voluntarily. In fact, appellant testified, at trial, that she did not care to have an attorney present during her questioning by Captain Faith. Tr. at 595. Finally, as to the specific issue of coerciveness, we do not find the shackling in any way influenced appellant's decision to make these statements to Captain Faith. It appears appellant decided to tell Captain Faith what really happened only when she learned her co-defendant Cassandra Clark had already done so. Accordingly, the trial court did not err when it denied appellant's motion to suppress as the trial court's findings of fact, concerning said motion, are not against the manifest weight of the evidence.
Appellant's First Assignment of Error is overruled.
 II
Appellant maintains, in her Second Assignment of Error, the jury's verdict is against the manifest weight of the evidence. We disagree.
On review for manifest weight, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172, 175. See also, State v. Thompkins (1997), 78 Ohio St.3d 380. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175. It is based on this standard that we review appellant's Second Assignment of Error.
Appellant argues the verdict is against the manifest weight of the evidence because the critical testimony that implicates appellant as the principal offender derives from self-serving statements of admitted accomplices Shawn McCardle and Cassandra Clark. Based on our review of the record, we find the evidence overwhelmingly establishes that appellant was the principal offender in the murder of Amanda French.
First, appellant confessed, on three separate occasions, to planning the murder and shooting Amanda French. The testimony of Cassandra Clark and Shawn McCardle is consistent with appellant's confessions. According to witnesses at trial, it was well-known that appellant did not like Amanda French, was very jealous of Amanda French because she was dating her ex-boyfriend and that she intended to kill Amanda French because of this jealousy. Further, appellant retrieved the murder weapon from her brother's residence. The evidence clearly establishes appellant, with prior calculation and design, deliberately caused the death of Amanda French. We do not find the jury lost its way and created a manifest miscarriage of justice. Therefore, the jury's verdict is not against the manifest weight of the evidence.
Appellant's Second Assignment of Error is overruled
For the foregoing reasons, the judgment of the Court of Common Pleas, Richland County, Ohio, is hereby affirmed.
By: Wise, P. J. Hoffman, J., and Farmer, J., concur.
---------------------------
---------------------------
 --------------------------- JUDGES
For the reasons stated in the Memorandum-Opinion on file, the judgment Court of Common Pleas of Richland County, Ohio, is affirmed.
---------------------------
---------------------------
 --------------------------- JUDGES
[1] We affirmed Denise Spicer's conviction for aiding and abetting aggravated murder in State v. Spicer (March 12, 1999), Richland App. No. 97-CA-31, unreported.